Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
10/20/2020 08:07 AM CDT

In re Interest of B.B. et al., children under
18 years of age.
State of Nebraska, appellee, v.
Amie B., appellant.

___ N.W.2d ___

Filed October 13, 2020.    No. A-19-1206.

1. **Juvenile Courts: Appeal and Error.** An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings.
2. **Juvenile Courts: Jurisdiction: Appeal and Error.** In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it.
3. **Jurisdiction: Words and Phrases.** Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved.
4. **Actions: Jurisdiction.** Lack of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte.
5. **Jurisdiction: Juvenile Courts.** Subject matter jurisdiction is vested in the juvenile court by an adjudication that a child is a juvenile described in Neb. Rev. Stat. § 43-247 (Reissue 2016).
6. **Jurisdiction: Juvenile Courts: Parent and Child: Immunity.** The immunity provision set forth in Neb. Rev. Stat. § 28-716 (Reissue 2016) which relates to mandatory reporting of suspected child abuse or neglect does not prohibit the juvenile court from acquiring jurisdiction of juveniles determined to be within the meaning of § 43-247(3)(a) (Reissue 2016), even when such reporting is made by the parent of the subject juvenile(s).
7. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

- 2 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

Appeal from the Separate Juvenile Court of Lancaster County: Roger J. Heideman, Judge. Affirmed.

Abby Osborn, of Shiffermiller Law Office, P.C., L.L.O., for appellant.

Patrick F. Condon, Lancaster County Attorney, and Shellie D. Sabata for appellee.

Steffanie J. Garner Kotik, of Kotik & McClure, guardian ad litem.

Moore, Chief Judge, and Bishop and Welch, Judges.

Bishop, Judge.

## I. INTRODUCTION

Amie B. appeals from an order of the juvenile court in an ongoing juvenile case that, in part, removed eight children from her home and also granted sibling visitation between three other children. In addition, she challenges the continuation of a placement hearing following an emergency placement order. And for the first time, she raises subject matter jurisdiction as a matter of plain error. We affirm.

## II. BACKGROUND

This case involves 11 children: B.B., born in 2004; N.B., born in 2005; Q.B., born in 2006; M.B., born in 2008; twins G.M. and Z.M., born in 2012; J.M., born in 2013; L.M., born in 2014; R.M., born in 2015; and twins C.M. and K.M., born in 2017.

Amie is the adoptive mother of B.B., N.B., Q.B., and M.B.; Anthony B., Amie's ex-husband, is the adoptive father of these four children. Amie is the biological mother of L.M., R.M., C.M., and K.M.; Gabriel M. is the biological father of these four children. In addition, Gabriel is also the biological father of G.M., Z.M., and J.M.; the biological mother of these three children either relinquished or otherwise had her parental rights terminated several years ago. Neither Anthony nor

- 3 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

Gabriel is part of this appeal, and they will only be discussed as necessary.

In the record before us, Gabriel is sometimes referred to as "Amie's fiance," and at other times, they are referred to as "husband and wife." However, at a hearing on November 21, 2019, Gabriel was asked, "Just to clarify, [Amie] is not your wife, correct?" Gabriel, via an interpreter, responded, "No." In any event, Amie and Gabriel lived together with all of the children (although Q.B. lived with Anthony for a period of time, including December 2018, but Q.B. returned to live in Amie and Gabriel's home sometime in February 2019).

On December 31, 2018, the State filed a motion for and was granted an ex parte order for the emergency temporary custody of N.B., based on allegations that he engaged in sexually assaultive behaviors toward some of his siblings within the family home. N.B. was placed in the temporary custody of the Nebraska Department of Health and Human Services (DHHS). In an order filed on January 14, 2019, the juvenile court noted that at a temporary custody hearing on January 9, Amie, Gabriel, and Anthony had no objection to the temporary legal and physical custody of N.B. remaining with DHHS for out-of-home placement, and the court entered its order accordingly. N.B. has remained out of the home ever since.

The State filed a petition on January 2, 2019, and amended petitions on January 14 and on April 29 (amended in court on April 25, but not filed until April 29), alleging that all 11 children were children as defined by Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) in that they were without proper parental support through no fault of Amie and Gabriel or that the children were in a situation dangerous to life or limb or injurious to their health or morals. As finally amended, the State specifically alleged that on one or more occasions since August 2018, N.B. engaged in sexually inappropriate behaviors with one or more of his siblings residing in the family home, and that despite safety planning, the family was unable to prevent continued incidents of inappropriate contact between the

- 4 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

siblings. The State further alleged that the situation placed the children at risk of harm.

In an order filed on April 29, 2019, the juvenile court adjudicated all 11 children as being within the meaning of § 43-247(3)(a), based on Amie's and Gabriel's no contest pleas to the allegations in the petition, as finally amended, at a hearing on April 25.

In its disposition order filed on June 20, 2019, the juvenile court found that the primary permanency plan for N.B. was reunification and that the primary permanency plan for the other 10 children was family preservation. The court ordered that N.B. was to remain in the custody of DHHS. The court ordered that the other 10 children be placed in the temporary legal custody of DHHS in order to ensure necessary services and oversight were provided; physical custody of those 10 children was to remain with Amie and Gabriel. N.B. was ordered to follow all conditions of his probation and placement, follow all recommendations from the evaluation completed by a named provider, and have no contact with his siblings except as approved by DHHS after consultation with the therapists. B.B., Q.B., M.B., G.M., Z.M., J.M., and L.M. were ordered to participate in individual therapy as arranged by DHHS. Amie, Gabriel, and Anthony were ordered to cooperate with family therapy when it was recommended by the children's therapists and to maintain legal means of income and appropriate housing. Finally, the court ordered that there was to be no physical discipline of the children by any parent or care provider. A review hearing was scheduled for September 5.

On August 29, 2019, the State filed a motion for and was granted an order approving an emergency change in placement for all of the children, except for N.B., from the home of Amie and Gabriel, based on allegations of sexual contact between siblings, domestic violence in the home, inappropriate physical discipline, and neglect (i.e., not enough food for the children). The court ordered temporary custody and placement of the children with DHHS, pending a placement hearing. A

- 5 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

hearing was set for September 4, but after a number of continuances, it was ultimately held on November 21.

On November 12, 2019, N.B.'s guardian ad litem (GAL), on behalf of N.B., filed a motion asking the juvenile court for an order approving sibling visitation between N.B. and his brothers, B.B. and Q.B. A hearing on the motion was set for November 21.

On November 21, 2019, and as relevant to this appeal, the matter came on for a hearing for review of disposition, a placement hearing pursuant to the court's August 29 order, and a hearing on the motion for sibling visitation. A summary of the relevant evidence follows.

Rebekah Henderson, a DHHS children and family services specialist, had been assigned to this case since January 2019. Henderson testified that prior to August, it was "difficult" to set meetings with Amie and see the children. When asked if there were scheduling issues because of the commitments of the family, Henderson responded, "I'm not sure why it was difficult. I know there were baseball and different activities that went clear into the evening which made it very difficult to schedule the meetings."

Henderson testified that Linda Marcy, M.B.'s therapist, forwarded Henderson a copy of an email Marcy received from Nicole Sabata on August 28, 2019. Sabata is the therapist working with Z.M., J.M., and L.M. And according to Henderson, Marcy oversees Sabata. In the email, which was received into evidence, Sabata stated that she was told that Z.M. (girl, approximately age 7 in 2019) and L.M. (girl, approximately age 5 in 2019) shower together; according to Sabata, it "is a concern if any siblings are showering together since there [have] been problems with sexualized behavior already." L.M. told Sabata that B.B. and Q.B. (boys, approximately ages 15 and 13 in 2019) "used to put their private parts into her private parts, but they no longer do it as [she] sleeps in her parents room." L.M. also reported that Amie was "very mean to her and will yell, ignore, and grab her arm putting her to bed."

- 6 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

And L.M. reported being "spank[ed]" by Gabriel, but she also indicated that she was not being spanked anymore. Sabata witnessed Gabriel "pull" on the children's arms to get them to quit doing things and to come for sessions, and she felt "it was more aggressive than it should have been." Sabata also stated that she had been told by the children that there were days when they would go to bed without eating dinner.

Henderson forwarded the email to her supervisor, who then called Sabata to verify the information in the email. After that, an affidavit for emergency placement was drafted. A motion for emergency placement was filed, and an order was entered on August 29, 2019. Thereafter, the children were interviewed at the Child Advocacy Center (CAC).

Henderson was able to listen in on the CAC interviews as they were occurring. Henderson stated that during L.M.'s interview, L.M. was not specifically asked if B.B. or Q.B. put their privates in her privates, but when L.M. was asked general questions about inappropriate sexual touching and whether anyone had touched her, L.M. said, "No." When reminded that she disclosed some things to her therapist, L.M. said that she did not want to talk about it and that she already told her therapist so she should not have to talk about it anymore.

Henderson testified that during the CAC interviews, Q.B. stated he heard Amie "yell at the kids to stop touching each other's butts, but he didn't actually see anything physically." According to Henderson, during B.B.'s interview, he stated that "the little kids do touch each other while they're in the shower together. . . . [H]e saw the boys touching each other's penises and butts when they were showering together when he walked by." B.B. "also stated when the kids would go outside to play, he would see both girls and boys take off all their clothes and touch each other like they do in the shower"; he said "they would turn on the water hose and get everything wet and jump on the trampoline with no clothes on." B.B. stated it was M.B.'s job to watch the children. (M.B. is a girl, approximately age 11 in 2019.) When asked if B.B. gave a

- 7 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

timeframe for when this was occurring, Henderson said he did not give a specific date, but it was sometime after Q.B. had come back to the home. Q.B. returned to Amie's home in February 2019.

According to Henderson, during G.M.'s CAC interview, he was asked about discipline in the home, and G.M. "state[d] he would get time-outs, spanking by mom with a belt on his bumm-bumm." Henderson stated that a timeframe for such discipline was not specified.

Henderson testified her supervisor was told by Sabata that Amie refused to sign a safety plan. However, Amie testified that she did not refuse to sign the safety plan, but, rather, before signing it, she needed clarifications as to when she was supposed to call the police or the "hotline" when rules were broken (e.g., tickling, horseplay, wrestling, or entering a room without knocking). According to Amie, it was agreed that it would be discussed later, as documented in an email exchange. A copy of an email exchange between Amie and Marcy appears in our record. In the exchange, Amie inquired, "Was the revised version done or not yet? If so I would also like a copy of that one." Marcy responded, "My plan was to meet with you individually after the kiddo's got into school and to make sure we have everything on there." Amie testified that a new safety plan was never submitted to her.

According to Henderson and her court report received into evidence, some of the children have been exhibiting sexualized behaviors as reported by their foster parents; this is also noted in a GAL report that was received into evidence. The reports also state that the foster parents for some of the children have expressed concerns about the children's educational progress. According to Amie's testimony, at the beginning of the 2019-20 school year, Amie made a school change for the middle five children. She moved them from public school to an unaccredited school, which Amie agreed was essentially a group of homeschool individuals.

According to Henderson, there were ongoing concerns about the children's safety if they were to be returned to Amie's

- 8 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

home. Henderson recommended that intensive family reunification services and a safety plan be implemented and that the children be returned gradually and not all at once.

Amie testified the she had successfully completed intensive family supervision, which had been set up in January 2019. She also stated that family support had been in the home since July. When asked about criticism that she did not make time available for family support, Amie said that "it wasn't that we were not willing to meet with [family support], it was just coordinating a time that we would be available," because "[w]ith this many children . . . many of them are in sports and over the summer had lots of sports activities going on." Amie stated she had been working with family support since the removal of the children. Amie was in support of therapeutic services for her children; she said that B.B. and N.B. had actually begun therapy in October 2018, "before any of this occurred."

When asked to address the issue of food availability in her home, Amie stated, "We've got plenty of food in our home." However, Amie said that she "refuse[d] to be a short-order cook" and that the rule was "if you don't want to eat it, then that's your decision," but she "wasn't going to make 20 different meals because everybody wanted something different."

When asked if she and Gabriel had ever been cited or had police contact because of domestic violence in the home, Amie responded, "Never." Amie said that she and Gabriel argue, but they do not fight; she does speak "quite loudly" to Gabriel because a hearing test indicated that he is in need of a hearing device. According to Amie, she and Gabriel stopped using corporal punishment in 2018. Separation, timeouts, and discussion are now used with the children.

Sibling visitation between N.B. and B.B. and Q.B. was also addressed at the hearing, and the relevant evidence will be discussed in the analysis section.

In its amended order filed on November 25, 2019, the juvenile court vacated the August 29 order of emergency

- 9 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

placement. However, the court ordered that the children, with the exception of B.B. and Q.B., were to remain in their respective out-of-home placements "due to ongoing concern for the . . . children's safety in the home until such time as additional in-home services and an appropriate safety plan are implemented." The court found and ordered that B.B. and Q.B. should be placed in Amie's home, as there were no barriers or safety concerns that would prevent their return. All 11 children were to continue in the legal custody of DHHS.

The juvenile court ordered B.B., Q.B., M.B., G.M., Z.M., J.M., and L.M. to participate in individual therapy as arranged by DHHS. Amie, Gabriel, and Anthony were ordered to cooperate with family therapy when it was recommended by the children's therapists and to maintain legal means of income and appropriate housing. Amie and Gabriel were ordered to cooperate with intensive family preservation services and intensive family reunification services as arranged by DHHS. The court ordered that there was to be no physical discipline of the children by any parent or care provider.

DHHS was ordered to formulate a safety plan to transition the children, with the exception of N.B., home; the safety plan was to be completed and provided to the juvenile court and all parties no later than December 6, 2019. Amie and Gabriel were to have reasonable rights of supervised parenting time with utilization of safety planning with M.B., G.M., Z.M., J.M., L.M., R.M., C.M., and K.M., as arranged by DHHS. Amie, Gabriel, and Anthony were to ensure all school age children were enrolled in an education program that complied with all applicable state laws.

N.B. was ordered to follow all conditions of his probation and placement and to follow all recommendations from the evaluation completed by a named provider.

The juvenile court ordered that N.B. was to have supervised sibling visitation with B.B. and Q.B., with specified provisions.

Amie appeals the juvenile court's amended order dated November 25, 2019.

- 10 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

## III. ASSIGNMENTS OF ERROR

Amie assigns the juvenile court erred in (1) failing to address plain errors contained in the record, including continuing jurisdiction over the minor children (except for N.B.) and not returning legal custody to Amie, as she was the reporting party and immune to jurisdiction pursuant to Neb. Rev. Stat. § 28-716 (Reissue 2016); (2) continuing the contested removal hearing on October 8, 2019, thus depriving her of due process; and (3) ordering sibling visitation between B.B., Q.B., and N.B. against B.B.'s and Q.B.'s best interests.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Michael N.*, 302 Neb. 652, 925 N.W.2d 51 (2019).

## V. ANALYSIS

### 1. Jurisdiction and Immunity

Amie did not appeal the April 2019 adjudication of the children. However, she asks this court to review the record for plain error and find that the juvenile court's jurisdiction over all of the children, except for N.B., should be vacated. Amie also asks that we direct the juvenile court to enter an order terminating jurisdiction over her as it relates to all of the children, except for N.B. In support of her argument, Amie contends that despite being the one to report concerns that N.B. could not continue to reside in her home, a juvenile petition was filed against her which unjustifiably subjected her other minor children to the jurisdiction of the juvenile court in violation of the § 28-716 mandate of immunity. Amie also contends that in addition to taking proactive steps regarding N.B.'s behavior, she continually met all of the children's needs, and therefore, the evidence was not sufficient to support the adjudication under the petition.

- 11 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

[2] In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015).

### (a) Subject Matter Jurisdiction

[3,4] Subject matter jurisdiction is the power of a tribunal to hear and determine a case in the general class or category to which the proceedings in question belong and to deal with the general subject matter involved. *In re Interest of Jeremy U. et al.*, 304 Neb. 734, 936 N.W.2d 733 (2020). Lack of subject matter jurisdiction may be raised at any time by any party or by the court sua sponte. *In re Interest of Kirsten H.*, 25 Neb. App. 909, 915 N.W.2d 815 (2018).

[5] Section 43-247 provides for the juvenile court's jurisdiction over certain individuals and proceedings. *In re Interest of Jeremy U. et al., supra*. See, also, *In re Interest of Devin W. et al.*, 270 Neb. 640, 707 N.W.2d 758 (2005) (with regard to juvenile court adjudication proceedings under § 43-247, subject matter jurisdiction is vested in juvenile court by adjudication that child is juvenile described in § 43-247).

The subject matter jurisdiction of the juvenile court relative to this case is set forth in § 43-247, which provides, in relevant part, as follows:

> The juvenile court in each county shall have jurisdiction of:
>
> . . . .
>
> (3) Any juvenile (a) who is . . . without proper support through no fault of his or her parent, guardian, or custodian; . . . who is in a situation . . . dangerous to life or limb or injurious to the health or morals of such juvenile . . . .
>
> . . . .
>
> (5) The parent, guardian, or custodian of any juvenile described in this section; [and]
>
> . . . .

- 12 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

(12) Except as provided in subdivision (11) of this section, any individual adjudged to be within the provisions of this section until the individual reaches the age of majority or the court otherwise discharges the individual from its jurisdiction.

To obtain jurisdiction over a juvenile at the adjudication stage, the court's only concern is whether the conditions in which the juvenile presently finds himself or herself fit within the asserted subsection of § 43-247. *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018). The State must prove such allegations by a preponderance of the evidence. *Id*.

Here, the State alleged all 11 children were children as defined by § 43-247(3)(a) in that they were without proper parental support through no fault of Amie or that the children were in a situation dangerous to life or limb or injurious to their health or morals. As finally amended, the State specifically alleged that on one or more occasions since August 2018, N.B. engaged in sexually inappropriate behaviors with one or more of his siblings residing in the family home, and that despite safety planning, the family was unable to prevent continued incidents of inappropriate contact between the siblings. The State further alleged that the situation placed the children at risk of harm.

Amie pled no contest to the allegations in the petition, as finally amended, at the adjudication hearing. The State offered an exhibit containing police department reports into evidence as the factual basis at the hearing. The exhibit, which was received without objection, reveals the following.

On December 9, 2018, Amie advised the "Child Abuse Hotline" that she found out N.B. (13 years old) had allegedly been digitally penetrating two of his brothers—G.M. (6 years old) and J.M. (5 years old). Amie also suspected that N.B. may have perpetrated on other children within the home, most notably R.M. (3 years old). Interviews at the CAC were conducted on December 20. During those interviews, both G.M. and J.M. disclosed having their penises touched by N.B. and having

- 13 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

their anuses digitally penetrated by N.B. on countless occasions. J.M. also disclosed that R.M. was digitally penetrated by N.B. Additionally, both G.M. and J.M. disclosed having been "spank[ed]" with a belt by Gabriel. During the course of his CAC interview on December 21, R.M. was "either not understanding the conversation or did not want to talk" and the interview was ended. During her interview on December 21, L.M. (4 years old) disclosed that N.B. penetrated her vagina digitally and with his penis. L.M. said that when she told Gabriel that N.B. was touching her, Gabriel just made N.B. go to his room. She also disclosed that Amie and Gabriel spanked her with a belt. On December 28, Amie informed a DHHS caseworker that she believed N.B. had "re-offended last evening on [L.M.]" Amy reported that she saw L.M. leave N.B.'s bedroom around 8:30 p.m. and that upon questioning, L.M. told Amie that N.B. "'humped'" her. As a result, N.B. was interviewed by law enforcement. During his interview on December 28, N.B. admitted inserting his fingers into the exposed "butt cheeks" of G.M. and J.M., but N.B. said his intent was not to insert his finger into their anuses. N.B. also admitted that 2 months prior, he lay on his side behind L.M. after he removed their pants and he placed his erect penis between L.M.'s legs up against her vagina and "'hump[ed]'" her from behind; however, he denied actually inserting his penis into her vagina. N.B. also stated that he and one of his brothers walked in on another brother "doing the same thing" to another sibling in the summer of 2018; however, none of the other children reported anything like this occurring. N.B. stated he had been struggling to control his sexual urges. It was decided that N.B. would be removed from the home.

Based on the factual basis and Amie's no contest plea, the State proved the allegations in the amended petition by a preponderance of the evidence. Accordingly, the juvenile court properly acquired jurisdiction over all 11 children and their mother, Amie, when it found the conditions fit within § 43-247(3)(a) and adjudicated the children as juveniles

- 14 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

within the meaning of § 43-247(3)(a). See, § 43-247(3)(a) and (5); *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018).

(b) Immunity

As noted previously, Amie contends that despite being the one to report concerns that N.B. could not continue to reside in her home, a juvenile petition was filed against her which unjustifiably subjected her other minor children to the jurisdiction of the juvenile court in violation of the "mandate of immunity" set forth in § 28-716. Brief for appellant at 41. As a result, she suggests that this court should direct the juvenile court to terminate jurisdiction over her as it relates to all of the minor children except for N.B. However, we do not read the immunity provision for a person required to report child abuse or neglect as set forth in § 28-716 as precluding the juvenile court from acquiring jurisdiction over Amie and all of her children under the juvenile code.

Section 28-716 is part of the Child Protection and Family Safety Act. See Neb. Rev. Stat. §§ 28-710 to 28-727 (Reissue 2016, Cum. Supp. 2018 & Supp. 2019). Section 28-716 states:

Any person participating in an investigation or the making of a report of child abuse or neglect required by section 28-711 pursuant to or participating in a judicial proceeding resulting therefrom shall be immune from any liability, civil or criminal, that might otherwise be incurred or imposed, except for maliciously false statements.

Notably, Amie is not being subjected to civil or criminal liability as a result of reporting concerns related to N.B. in the present case. Section 28-716 is found in chapter 28 of the Nebraska Revised Statutes, which chapter pertains to "Crimes and Punishments," specifically article 7, which relates to "Offenses Involving the Family Relation." The language of § 28-716 establishes that immunity from any liability, civil or criminal, is available to a person participating in an investigation or making a report of child abuse or neglect as required

- 15 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

by § 28-711. Section 28-711 relates to mandatory reporting to law enforcement or DHHS by physicians, medical institutions, nurses, school employees, social workers, the Inspector General of Nebraska Child Welfare, or any other person who has reasonable cause to believe a child is being subjected to conditions or circumstances which reasonably would result in child abuse or neglect. "The Legislature declared that it was the public policy of the State to protect children who may be subject to abuse or neglect and to require the reporting of child abuse or neglect in certain settings." *Holloway v. State*, 293 Neb. 12, 24, 875 N.W.2d 435, 446 (2016). See § 28-710.01 (it is policy of this state to require reporting of child abuse or neglect in home, school, and community settings). These types of mandatory reporting statutes reflect a state's strong public interest in protecting children from abuse by the policy of mandatory reporting of actual and suspected child abuse or neglect. See *Myers v. Lashley*, 44 P.3d 553 (Okla. 2002) (Oklahoma's child abuse reporting laws express state's strong public interest in protecting children from abuse by policy of mandatory reporting of actual and suspected child abuse or neglect to appropriate authorities and agencies, and with protection of children being priority, person who in good faith reports suspected child abuse or neglect shall have immunity from any liability, civil or criminal). Such mandatory reporting statutes are not designed to preclude juvenile courts from acquiring jurisdiction over children or their parents; to the contrary, they are designed to compel notification of child abuse or neglect to proper authorities in order to place such children and their parents under the supervision of the juvenile court system to help address such concerns and to protect from civil or criminal liability those persons whose mandatory reporting may lead to such investigations or proceedings. The goal is to protect the interests of children and to help parents strengthen and preserve their family. See § 28-710.01 (policy of this state to provide protective and supportive services designed to preserve and strengthen family in appropriate cases).

- 16 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

There is only one Nebraska case that cites to § 28-716, and it involved the immunity of state actors from a civil suit after a mother's name was entered into the Abused or Neglected Child Registry maintained by the then Nebraska Department of Social Services; the state actors, in their individual capacities, were immune from liability under state law pursuant to § 28-716. See *Shearer v. Leuenberger*, 256 Neb. 566, 591 N.W.2d 762 (1999), *disapproved on other grounds*, *Simon v. City of Omaha*, 267 Neb. 718, 677 N.W.2d 129 (2004).

Amie does not explain how being under the juvenile court's jurisdiction, designed to preserve and strengthen her family, equates to her being subjected to civil or criminal liability as a result of reporting her concerns related to N.B. The foremost purpose and objective of the juvenile code is the protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parents where the continuation of such parental relationship is proper under the law. *In re Interest of Corey P. et al.*, 269 Neb. 925, 697 N.W.2d 647 (2005). See, also, *In re Interest of Kane L. & Carter L.*, 299 Neb. 834, 910 N.W.2d 789 (2018) (purpose of adjudication phase of juvenile proceeding is to protect interests of child). Thus, the goal of juvenile proceedings is not to punish parents, but to protect children and promote their best interests. *In re Interest of Corey P. et al., supra*. The potential consequences of child protection proceedings range from an order requiring supervision of the child by a child protection agency, to leaving the child in the custody of the parents, to an order for the temporary or permanent removal of the child. *Id*. These consequences are designed to protect innocent children, not to punish parents; their effect on the parents is merely collateral to their main purpose. *Id*.

[6] Accordingly, we conclude that the immunity provision set forth in § 28-716 which relates to mandatory reporting of suspected child abuse or neglect does not prohibit the juvenile court from acquiring jurisdiction of juveniles determined to be within the meaning of § 43-247(3)(a), even when such reporting is made by the parent of the subject juvenile(s).

- 17 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

### (c) Legal Custody

Amie asks this court, in the event that jurisdiction continues, to direct the juvenile court to enter an order returning the legal custody of the children, except for N.B., to her. In its disposition order filed on June 20, 2019, the juvenile court ordered all 11 children be placed in the legal custody of DHHS. Amie did not appeal the June 20 disposition order. See *In re Interest of Taylor W.*, 276 Neb. 679, 757 N.W.2d 1 (2008) (dispositional orders are final and appealable). The juvenile court's subsequent orders merely continued the legal custody determination. See *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015) (dispositional order which merely continues previous determination is not appealable order). Regardless, even if Amie had timely appealed the June 20 disposition order, the evidence supported the juvenile court's decision. And the evidence supports the juvenile court's November 25 order that all 11 children continue in the legal custody of DHHS.

### 2. Continuation of Removal Hearing

Amie contends the juvenile court erred in continuing the October 8, 2019, contested hearing regarding the removal of the minor children from her custody, thus depriving her of due process.

### (a) Procedural History Subsequent to Emergency Removal

On August 29, 2019, the State filed a motion for and was granted an order approving an emergency change in placement for all of the children, except for N.B., from the home of Amie and Gabriel, based on allegations of sexual contact between siblings, domestic violence in the home, inappropriate physical discipline, and neglect (i.e., not enough food for the children). The court ordered temporary custody and placement of the children with DHHS pending a placement hearing, which the court set for September 4. However, in a subsequent order on August 29, the court, on its own motion, continued the

- 18 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

hearing scheduled for September 4 to September 5 to coincide with the next review hearing.

As revealed in an order filed on September 16, 2019, the matter came on for hearing on September 5. The juvenile court found that the review hearing and hearing regarding placement should be continued for good cause shown, on the motion of DHHS' counsel without objection. Accordingly, the matter was continued to September 17, and the August 29 order approving the emergency placement change was to continue in full force and effect until further order of the court.

As revealed in an order filed on September 23, 2019, the matter came on for hearing on September 17. However, Amie and Gabriel requested a continuance to investigate some newly provided information. The parties did not object and further agreed to the continuance as the investigation of new allegations was not completed, including CAC interviews. The court found that the review hearing and hearing regarding placement should be continued for good cause shown, by agreement of counsel, and the matter was continued to October 8. And the August 29 order approving the emergency placement change was to continue in full force and effect until further order of the court.

At the hearing on October 8, 2019, the State and DHHS requested a continuance because the investigation was ongoing and interviews were still occurring at the CAC, as were medical examinations. Additionally, the day before the hearing, the State and DHHS had received a number of DVD's containing video recordings of the CAC interviews that had been completed, but they had not yet been able to review those completed interviews. The State contended that without a concluded investigation, it was not in a position to determine whether an additional filing would be necessary. The GAL for eight of the children (all but N.B., B.B., and Q.B.) stated her belief that "the results of that investigation, whether or not there will be any further filings, are things that need to be determined prior to the issues of placement being heard by the Court." That GAL, as well as the GAL for N.B. and the GAL

- 19 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

for B.B. and Q.B., had no objection to a continuance. However, Amie, Gabriel, and Anthony did object to a continuance.

As relevant to this appeal, Amie objected to the continuance because:

> This removal of the children from the parental home occurred — heard by a different judge on the evening of August 28th, so it's been over 40 days. And, typically, the — a removal would include an order that mandates that the County Attorney, if they're going to file additional allegations, a supplemental petition or whatever, would be set out in the order removing the children or changing their placement. That hasn't happened here and that is what creates some of the difficulties for the parents.
>
> We don't have the ability to meet or provide them due process in this situation. So for that reason, we object to the continuance as requested.

The juvenile court stated:

> At this point, there has been a judicial finding of probable cause to make the placement change. That triggered the hearings because that decision was contested and continues to be contested. The grounds for the removal involved new allegations that have not been adjudicated at this point, even though we are at [sic] dispositional phase as it relates to the family and the legal custody of children has been placed with [DHHS].
>
> Um, at this point, the State has indicated they — they are determining whether or not they will file additional allegations. It appears that due process would require, before proceeding with the adhering [sic], that there would be new filings because they are totally different allegations at this point. That's one reason I don't believe we can proceed today because of that issue.
>
> There has also been a request, because of the complexity of the case, I believe, and the number of children involved and the investigation that has been ongoing continually but has yet to be totally completed, that some additional time is needed. It's a very unusual situation

- 20 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

that presents itself. However, I understand the parties have received a date that they can appear, if the continuance is granted, that I believe would give adequate time for the State to make that determination so that a full hearing could be held with the protections of due process that are required.

. . . .

I had hoped that we could resolve these issues. I've set it three separate times in an attempt to do so. Unfortunately, I don't want to begin the case under the circumstances that I would not be able to complete it. So I don't want to require the parties to redo a case because I won't be here to hear the rest of it [(the matter was to be transferred to another judge due to the current judge's retirement)].

At this point, I think, unfortunately, the continuance is necessary. There are grounds to continue it, so I will grant the continuance. . . .

So, at this point, the temporary orders will continue in effect. The matter is continued.

Following the hearing on October 8, 2019, the court filed its written order on October 16. In its written order, the court found that the newly assigned judge should hear the totality of the evidence. The court further found "the allegations that comprise the basis for the placement change removal are allegations that have not been adjudicated or pled and are substantially different from the matters adjudicated." And "[d]ue process requires a further filing if the State is seeking continued removal on the grounds set out in the placement change." The review hearing and hearing regarding placement was continued to November 21, and the August 29 order of emergency placement change was to continue in full force and effect until further order of the court.

In an order filed on November 19, 2019, the juvenile judge now assigned to the case set a filing deadline. The order states, "Due process requires further filing if the State is seeking continued removal of any or all of said children on the grounds set out in the placement change. It is improper for continued

- 21 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

'investigation' by the State at the cost of the children's removal from their home." Accordingly, the court found and ordered that the August 29 order of emergency placement change "shall expire if the [State] does not file a Supplemental Petition in this matter by November 20, 2019, at 4:00 p.m."

On November 21, 2019, the matter came on, in part, for the review hearing and hearing regarding placement. At the beginning of the hearing, the juvenile court noted that a supplemental petition had not been filed and that therefore, the court was going to vacate the emergency placement order. The court continued by stating that the matter was before it on review of the prior disposition and "[p]lacement matters can always be addressed by the Court in the context of a review hearing as well." The review hearing proceeded with testimony and evidence as set forth previously.

### (b) Juvenile Court's Order

In its amended order filed on November 25, 2019, the juvenile court vacated the August 29 order of emergency placement. However, the court ordered that the children, with the exception of B.B. and Q.B., "should be placed in out-of-home placements as returning them to the home would be contrary to their health, safety, and welfare due to their parents' need to engage in Court-ordered services designed to ensure their safety, specifically the implementation and utilization of intensive in-home services and safety plans"; those nine children were to remain in their current placements. The court found and ordered that there were no barriers or safety concerns that would prevent the return of B.B. and Q.B. to the home of Amie. All 11 children were to continue in the legal custody of DHHS.

### (i) Delay in Emergency Placement Hearing

Amie claims that she was deprived of the ability to parent her children for 85 days without an opportunity to be heard. However, it is the last 44 days—the time between the

- 22 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

continued October 8, 2019, hearing and the November 21 hearing—that she takes issue with. And she asks this court to "declare that [her] Due Process Rights were violated when the contested hearing on the removal of the minor children was continued over [her] objection." Reply brief for appellant at 7.

In support of her argument that her due process rights were violated, Amie cites to *In re Interest of R.G.*, 238 Neb. 405, 423, 470 N.W.2d 780, 792 (1991) (concluding ex parte temporary detention order was nonfinal and thus not appealable, but that later detention order was final, appealable order; then finding that mother's due process rights were not violated by 14-day delay between entry of ex parte order and detention order when she was given opportunity to be heard at detention hearing and was allowed to visit her children in interim; cautioning however that "the 14 days elapsing between the entry of the ex parte order and the hearing poise the procedures employed in [that] case on the brink of unreasonableness"), *disapproved on other grounds, O'Connor v. Kaufman*, 255 Neb. 120, 582 N.W.2d 350 (1998). She also cites to *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004) (Supreme Court conducted de novo review of entire record because plain error permeated entire proceedings leading to termination of parental rights; deprivations of due process commenced at initial stages of proceedings, beginning with failure to hold detention hearing, and continued through adjudication, disposition, and review hearings). However, the GAL refers us to an unpublished case, *In re Interest of Don'Kaveon S. et al.*, No. A-14-019, 2014 WL 2581437 (Neb. App. June 10, 2014) (selected for posting to court website), wherein this court concluded that a mother's due process rights were not violated when 8 months elapsed between entry of the ex parte order for immediate custody and the conclusion of the detention hearing and subsequent order and that the initial delay was at the mother's request, she joined in one other request for a continuance, and several hearings were held

- 23 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

and then continued because additional time was necessary to receive evidence. But see *In re Interest of Carmelo G.*, 296 Neb. 805, 896 N.W.2d 902 (2017) (mother's procedural due process rights violated by unreasonable delay of more than 8 months between issuance of ex parte order for immediate temporary custody and that of protective custody order—one hearing continued for judge recusal and several hearings continued for insufficient time; Supreme Court vacated protective custody order and remanded cause for further proceedings).

However, the present case is distinguishable from the cases cited by the parties, because in those cases the parties were appealing from a final detention order following a hearing—with the exception of *In re Interest of Mainor T. & Estela T., supra*, which addressed the ex parte order and detention issue in an overall plain error review of the termination of parental rights appeal.

The procedural posture of the present case is much different. In this case, the emergency order of August 29, 2019, was vacated—orally at the hearing on November 21 and in writing in the November 25 order. Thus, the issue of any delay of the contested placement hearing on October 8 is now moot.

### (ii) Out-of-Home Placement
### After Review Hearing

After the juvenile court stated that it was vacating the order dated August 29, 2019, it proceeded with the dispositional review hearing (related to April 29 amended petition and adjudication and to June 20 order of disposition). And as noted by the juvenile court, placement matters can always be taken up during a review hearing. See Neb. Rev. Stat. § 43-284 (Reissue 2016) (court may enter dispositional order removing juvenile from his or her home upon written determination that continuation in home would be contrary to health, safety, or welfare of such juvenile and that reasonable efforts to preserve and reunify family have been made if required). It was under the umbrella of the November 21 review hearing that the juvenile

- 24 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

court ultimately determined that reasonable efforts had been made, but that N.B. and the eight youngest children should be placed in out-of-home placements "as returning them to the home would be contrary to their health, safety, and welfare due to their parents' need to engage in Court-ordered services designed to ensure their safety, specifically the implementation and utilization of intensive in-home services and safety plans." However, the court ordered that B.B. and Q.B. should be placed in Amie's home as there were "no barriers or safety concerns" as to such placement. Other than the subject matter jurisdiction issue previously addressed, Amie does not specifically challenge the portion of the juvenile court's November 25 order placing the youngest eight children in out-of-home placements.

### (c) Adoption Subsidy

[7] Amie argues, but does not specifically assign, that the continuation of the October 8, 2019, hearing deprived her of "the financial interest in the adoption subsidy which was removed without notice." Brief for appellant at 32. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). Because Amie did not specifically assign error to the adoption subsidy issue, it will not be addressed on appeal.

### 3. SIBLING VISITATION

Amie argues that the sibling visitation order between N.B. and B.B. and Q.B. was against B.B.'s and Q.B.'s best interests. We disagree.

Pursuant to Neb. Rev. Stat. § 43-1311.02(4) (Cum. Supp. 2018), parties to the case, including a child's sibling, may file a motion for joint-sibling placement, sibling visitation, or ongoing interaction between siblings. N.B. filed a motion to have sibling visitation with B.B. and Q.B—all three children, as well as Amie, were under the jurisdiction of the juvenile court.

- 25 -

Nebraska Court of Appeals Advance Sheets
29 Nebraska Appellate Reports
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

At the hearing on November 21, 2019, Amie testified that she wanted to ensure all of the children's safety and make sure that B.B. and Q.B. have the "tools necessary" for sibling visits.

A November 20, 2019, letter from Lawrence Gardiner was received into evidence. Gardiner provided individual therapy for B.B. and Q.B., as well as family therapy. In his letter, Gardiner stated:

> As it pertains to my recommendation on the boys beginning any visits with [N.B.], I will need to be able to speak with [N.B.'s] therapist in order to make my determination. Because of allegations by DHHS of predatory behavior from [Q.B.], [N.B.], and [B.B.], I hesitate to consent to their visitation without further consultation with the therapist treating [N.B.]

However, Henderson testified that DHHS was recommending a new individual therapist for B.B. and Q.B. because she had not had great communication with Gardiner; she also confirmed that Gardiner had been working with the family (including Amie) for more than a year and that it was not always clear to Henderson who Gardiner's clients actually were. The GAL for B.B. and Q.B. also noted concerns about Gardiner. In her November 21 report, the GAL stated:

> I feel that the current therapist for the children is not meeting their needs. I do not believe he has had a session with the children since their removal. He has not been forth coming with information when I have requested it. I believe these children need to have a therapist that will meet with them.

Contrary to Gardiner's "hesitation" and Amie's concerns above, N.B.'s therapist "[did] not have any concerns with [N.B.] visiting with [B.B. and Q.B.] at this time," as stated in an October 2019 letter that was received into evidence. And N.B.'s therapist, who was trained to work with youth that have sexually harmed, had been working with N.B. for 2½ months, during which time N.B. attended individual sessions at least twice per week and participated in group

- 26 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
29 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF B.B. ET AL.
Cite as 29 Neb. App. 1

sessions at least five times per week. Furthermore, according to Henderson's testimony, DHHS has no concerns about supervised visits between N.B. and B.B. and Q.B., and DHHS is in support of such visits. And according to Amie's own testimony, B.B. and Q.B. indicated they want to have contact with N.B.

The juvenile court ordered that N.B. should have visitation with B.B. and Q.B. provided that the visitation (1) is supervised by a professional visitation agency; (2) equals or exceeds 3 hours per week; (3) includes instructions to the professional visitation company worker(s) requiring them to monitor discussion among the brothers and prevent discussion of the case and/or any related juvenile law violation investigation(s); and (4) is arranged by DHHS, including transportation to and from the visits and identifying the location of the visits.

Although Amie argues that therapeutic visitation should have been ordered, we find that the supervised visits, as ordered by the juvenile court, did take into account the best interests of B.B. and Q.B., especially when considering the juvenile court's amended order also provided that B.B. and Q.B. were to participate in individual therapy as arranged by DHHS and that the therapists were to be qualified to provide trauma therapy and therapy for child victims of sexual assault.

## VI. CONCLUSION

For the reasons set for above, we affirm the November 25, 2019, amended order of the juvenile court.

AFFIRMED.